Henry J. KIRKSEY, Fred L. Banks, Jr., Carsie A. Hall, Henrene Matthews, Herman "Tex" Wilson, Shawn Knox, Malcolm T. Shepherd, Ricky L. Taylor, Annie K. Ward, Irene Shepherd, Rubie J. Tobias, Fannye B. White, Roy Milton Shelby, Monzell Stowers, Perthean Toins, Reverend Horace L. Buckley, and Douglas L. Anderson, Plaintiffs,

v.

CITY OF JACKSON, MISSISSIPPI, Russell C. Davis, Mayor, Thomas B. Kelly, Commissioner, and Douglas W. Shanks, Commissioner, Individually and in their official capacities as members of the City Council of the City of Jackson, City of Jackson Municipal Democratic Executive Committee, R. E. Wooley, Chairman of the City Democratic Executive Committee, City of Jackson Municipal Election Commission, Edmund Johnston, Jr., Mrs. Bernice Denmark, and Albert P. Dillon, members of the City Election Commission, Defendants.

Civ. A. No. J77–0075(N).

United States District Court,
S. D. Mississippi,
Jackson Division.

Aug. 28, 1978.

Frank R. Parker, Michael A. Middleton, Thomas J. Ginger, Jackson, Miss., for plaintiffs.

Joseph P. Wise, Thomas G. Lilly, John E. Stone, City Atty., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

This Memorandum Opinion shall constitute this Court's specific findings of fact

and conclusions of law required by Rule 52, F.R.Civ.P. and mandated by the United States Court of Appeals for the Fifth Circuit in its opinion of March 29, 1978, in the four consolidated voting dilution cases of *Nevett v. Sides,* 571 F.2d 209 (5th Cir. 1978) (hereinafter referred to as *Nevett II* ); *Bolden v. City of Mobile, Alabama,* 571 F.2d 238 (5th Cir. 1978); *Blacks United, Etc. v. City of Shreveport,* 571 F.2d 248 (5th Cir. 1978); and *Thomasville Branch of N.A.A. C.P. v. Thomas City, Ga.,* 571 F.2d 257 (5th Cir. 1978).

This action was brought by Henry J. Kirksey and other black plaintiffs, all registered voters of Jackson, Mississippi, and representing all black citizens and black registered voters of Jackson as a class, contending that the present at-large system of electing the mayor and two city commissioners for the City of Jackson abridges the rights of the city's black citizens as secured by the Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1971, 1973 and 1983.[1]

The plaintiffs allege that the existing commission form of government[2] which consists of two commissioners and a mayor who also functions as a commissioner, each of whom is a fulltime employee assigned specific functions, i. e., responsible for supervising the work of several specified city departments, and elected from the city at-large to four-year terms of office without any subdistrict residency requirement, unconstitutionally discriminates against black residents of Jackson by diluting or cancelling out their voting strength. They also complain of a denial of their statutory rights under 42 U.S.C. §§ 1971, 1973 and 1983.

Jurisdiction of this action is premised on 28 U.S.C. §§ 1331, 1343, and 2201, and 42 U.S.C. §§ 1971(d) and 1973f.

The defendants are the City of Jackson, a municipal corporation, the former city council consisting of Mayor Russell C. Davis and Commissioners Thomas B. Kelly and Douglas W. Shanks, sued individually and in their official capacities;[3] the Jackson Municipal Democratic Executive Committee and its chairman and the Jackson Municipal Election Commission and its members. The Jackson Municipal Republican Committee and its chairman were dismissed as defendants by Order of this Court dated March 28, 1977.

The verified complaint was filed herein on March 10, 1977, after the defeat of a citywide referendum held on February 22, 1977 on the issue of changing the form of city government in Jackson to that of a mayor-council under which the council members would have been elected from seven single-member districts or wards. The plaintiffs seek (1) a declaratory judgment that at-large, citywide voting for members of the Jackson City Council under the commission form of government unconstitutionally minimizes and cancels out black voting strength; (2) an injunction enjoining any further municipal primary or general elections for members of the city council on the basis of at-large, citywide voting; (3) an order requiring the defendants to adopt and place into effect a mayor-council form of government authorized by Miss.Code Ann. §§ 21–8–1, –47. (Supp.1976), providing for the election of nine members of the city council from nine single member districts, at least three of which would have black voting majorities; and (4) attorneys' fees, necessary expenses of this litigation, taxable costs and such other relief as may be just and equitable.

1. On June 24, 1977 this Court certified this as a class action pursuant to F.R.Civ.P. 23(a) and (b), the class being defined as "all black citizens and black registered voters of the City of Jackson, Mississippi."

2. The commission form of government under Mississippi law is defined in Miss.Code Ann. §§ 21–5–1, –23 (1972).

3. Although these individual defendants will remain as defendants in their individual capacities, their successors in office will be substituted as defendants in their official capacities, pursuant to F.R.Civ.P. 25(d).

The defendants admit that the plaintiffs are black citizens and registered voters of Jackson; that Jackson is majority white in population, voting age population, and registered voters; that in the past blacks have been discriminated against both in Mississippi and in Jackson; that since the Commission form of government was adopted in Jackson in 1912, no blacks have been nominated or elected to any position on the Jackson City Council, although several have been candidates therefore; that there are no ward or district residency requirements for candidates; that Jackson municipal elections are governed by a majority vote requirement to win party nomination or a special election to fill a vacancy; and that there is a full-slate or anti-single shot voting requirement.

Plaintiffs filed a Motion for Preliminary Injunction on March 21, 1977, seeking to halt the municipal Democratic and Republican elections scheduled for May 10, 1977 and the municipal general election scheduled for June 7, 1977. On March 31, 1977, after an extensive hearing on the Motion, this Court in an oral bench opinion denied plaintiffs' Motion for Preliminary Injunction. This denial was appealed to the United States Court of Appeals for the Fifth Circuit, which, on April 21, 1977, denied plaintiffs' Motion for a Preliminary Injunction, pending appeal, to halt the then upcoming municipal primary and general elections. The Fifth Circuit directed this Court to "expedite the hearing on the merits at the earliest feasible time," *Kirksey v. City of Jackson,* 552 F.2d 156 (5th Cir. 1977), and on remand, pursuant to the mandate of the Fifth Circuit, this Court tried this case on July 6 thru 8, 1977.

## I. VOTING DILUTION PRINCIPLES AND METHOD OF PROOF

■ This Court recognizes its obligation to make specific findings under each of the principal and enhancing criteria articulated in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) (*en banc*), *aff'd per curiam on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), the polestar of this Circuit which sets forth the constitutional precepts of *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), as mandated by the Fifth Circuit in *Nevett II* and its companion cases. After specific factual findings are made under each of the *Zimmer* criteria, we must then determine whether the aggregate of the evidence preponderates in favor of a finding of dilution by fully weighing and balancing all of the specific findings made in conformity with the *Zimmer* criteria.

The necessity of following the foregoing mandated procedure emanates from the Court of Appeals' holding in *Nevett II* and its companion cases that *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) requires the plaintiffs in a voter dilution case, also referred to as a "qualitative" reapportionment case, to prove by a preponderance of the evidence intentional or purposeful discrimination in racially based voting dilution claims founded on both the Fourteenth and Fifteenth Amendments to the United States Constitution. *Nevett II, supra* at 219.

The *en banc* court in *Zimmer* synthesized the dilution principles of *Regester* and *Chavis* by establishing certain primary and enhancing factors that a District Court must address in deciding a dilution case. The factors which are seen to go primarily to the ultimate issue of dilution are: (1) access to the process of slating candidates; (2) responsiveness of representatives to the particular needs of the complaining minority; (3) presence or absence of a tenuous state policy in favor of at-large districting; and (4) existence of past discrimination that precludes effective participation by a minority in the electoral system. The foregoing criteria go primarily to the issue of denial of access or dilution, that is, the denial to minority voters of a real opportunity to meaningfully participate in the political process, and not just the right to cast a vote that can be completely ignored under the provision of governmental protection

and governmental services because an election system is so operated as to make that vote meaningless in the election outcome.

Zimmer also established what is referred to as enhancing factors, that is, certain structural voting devices that may enhance the underlying dilution, if any, that exists. These are: (a) the size of the district in question; (b) the portion of the vote necessary for election (majority or plurality); (c) whether positions are contested for individually, and the number of candidates for which an elector must vote (anti-single shot voting provisions); and (d) whether candidates must reside in geographic sub-districts.

Nevett II and its companion cases hold that the required showing of intentional discrimination which is essential to a valid voter dilution claim under both the Fourteenth and Fifteenth Amendments may be satisfied by direct or circumstantial evidence, the former, although easily establishing a case of voter dilution, being very rare and difficult to prove, thus resulting in an inquiry of whether plaintiffs have succeeded in meeting their burden of proof based upon circumstantial evidence, bearing in mind that establishment of the Zimmer criteria constitutes circumstantial evidence of the presence or absence of the required intentional discrimination in the form of voting dilution.

Several established principles must be kept in mind in determining the ultimate issue in a voting dilution case, that is, whether the districting plan under attack exists because it was intended to diminish the political efficacy of a certain group. This ultimate issue must be determined by weighing the aggregate of the sub-issue findings. Nevett II, supra at 226.

■ A finding that the plaintiff has prevailed under one or even several of the Zimmer criteria may not establish the existence of intentional discrimination. See, e. g., McGill v. Gadsden Co. Commission, 535 F.2d 277 (5th Cir. 1976). The evidence under the other criteria may weigh so heavily in favor of the defendants that the evidence as a whole will not bear an inference of invidious discrimination. On the other hand, the plaintiff need not prevail under all of the criteria, Zimmer, supra at 1305, nor is he limited to only those elements of proof. Kirksey v. Board of Supervisors of Hinds County, Mississippi, 554 F.2d 139 (5th Cir. 1977) (en banc) cert. denied 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977) (by a proof of an aggregation of at least some of the Zimmer factors or similar ones, a plaintiff can demonstrate that the members of a particular group in question are being denied access). The task before the factfinder is to determine, under all the relevant facts, in whose favor the "aggregate" of the evidence preponderates in each case; it comprehends "a blend of history and an intensely local appraisal of the design and impact of the [at-large] district in the light of past and present reality, political and otherwise." White v. Regester, 412 U.S. at 769–70, 93 S.Ct. at 2341. As stated in Nevett II, the finder of fact must carefully "weigh the competing factors to determine whether the coincidence of those probative of intentional discrimination is sufficient. 'Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' Arlington Heights v. Metropolitan Housing Corp., 429 U.S. [252], at 266, 97 S.Ct. [555], at 564, 50 L.Ed.2d 450 (1977)", Nevett II, supra at 224.

Having fully discussed the established voting dilution principles, including the burden on the plaintiffs of proving by a preponderance of the evidence an intentional discrimination, we must now specifically decide the factual sub-issues as taught by Nevett II.

## II. THE PRIMARY FACTORS

### A. Black Access to the Electoral Processes in Jackson

The first of the primary Zimmer factors to be addressed is that of black access to the political or electoral process in Jackson. Although plaintiffs challenge the at-large election system in Jackson as racially dis-

criminatory, they do not contest the voter registration procedure or the procedure by which candidates presently qualify to run for political office. The forms utilized by the offices of the Hinds County Circuit Clerk and Jackson City Clerk in registering voters and qualifying candidates to run in municipal elections do not evidence a racially discriminatory purpose or present any impediments to blacks voting or qualifying to run for city office either in primary or general elections.

Jackson is the capital of Mississippi, its largest city, and one of two county seats of Hinds County. It is currently the largest bi-racial city in the United States (defined as one with 25% or greater black population) with a substantial black population which has no black representation on its municipal governing body. Jackson's 1970 population was 153,968, of whom 92,651 were white (60.17%) and 61,063 (39.66%) were black. The voting age population was 99,136, of whom 64,482 were white (65.04%) and 34,492 were black (34.79%). It comprises 105.36 square miles in area, having annexed approximately 40 square miles of territory in 1976 which was populated mostly by white persons. The city's Planning Board estimates that its current population is 205,000 persons with a voting age population (including the newly annexed area) of 157,589, of whom 104,985 are white (66.62%) and 52,604 are black (33.38%). The city voter registration rolls show a total registration (including the newly annexed area) of 93,058 persons, comprised of 67,711 whites (72.76%), and 25,132 blacks (27.01%) and 215 whose race is unknown (0.23%).

Anyone who seeks nomination in the Democratic or Republican primaries may do so by having his application certified by either the Democratic or Republican Executive Committee, that is, by having the Chairman of the appropriate committee certify to the City Clerk that the candidate has qualified to run in the primary. Candidates do not qualify or run for Commissioner by post number inasmuch as the Jackson City Council has never by ordinance provided that Commissioners be designated by Post Number One or Post Number Two, as authorized by the provisions of Miss.Code Ann. § 21–5–11 (1972). In that event such posts would be separated for election purposes and persons seeking the office of Commissioner would qualify and seek election for a specific post as designated by ordinance with each to be voted on separately by the qualified electors of the municipality as contemplated by Miss.Code Ann. § 21–5–5 (1972). In each primary election, voters must vote for one candidate for mayor and two for city commissioners. Single shot voting for commissioner is not permitted and unless two are voted for, the vote for commissioner is not counted. The two candidates for commissioner and the candidate for mayor receiving the majority of votes in the first or second primary are then certified to the Election Commission by the Democratic and Republican Executive Committees and each party's one candidate for mayor and two candidates for the two commissioner posts are then placed on the ballot for the general election which is conducted by the Jackson Election Commission appointed by the City Council. Independents may run in the general election and qualify with the City Clerk by filing a petition containing the signatures of fifty qualified voters. There is no limit on the number of independent candidates who may run for the posts of mayor or commissioner. In the general election, no single shot voting is permitted, and the electorate are permitted to vote for one candidate for mayor and are required to vote for two for commissioner. In all elections, both primary and general, in order to be elected, a candidate must receive a majority of the votes cast, and as many runoffs as are necessary are held. No qualifying fees need be paid by any candidate running in either the primary or the general election and certification by the party executive committee is a mere formality which is routinely given.

One of the named black plaintiffs has run for the office of Jackson City Commissioner, and between the years 1969 and 1973, four other black candidates have sought election to the Jackson City Council. Thus

black candidates are not denied the right to seek elective office in the City of Jackson.

■ By law no group is entitled to representation on the elected governing body in proportion to its voting potential, *White v. Regester,* 412 U.S. at 766, 93 S.Ct. 2332, so it is not constitutionally required that black voters elect at least some candidates of their choice regardless of their percentage turnout, *David v. Garrison,* 553 F.2d 923 (5th Cir. 1977); *Nevett II* at 216. In the same light, polarized or bloc voting in itself is not constitutionally objectionable; nevertheless, combined with the other factors discussed in this Opinion once proved, it is highly indicative of lack of access to the political processes and it is one piece of the circumstantial evidence puzzle whose successful completion supports the illation of dilution. *Bolden, supra,* at 243; *Nevett II, supra,* at 227.

The subject of past discrimination in Mississippi will be discussed later in more detail. As previously noted, the defendants concede the existence of past racial discrimination in the State of Mississippi and the City of Jackson, which was massive and obvious, and which prior to the enactment of the Federal Voting Rights Act of 1965 effectively disenfranchised blacks in violation of the Fifteenth Amendment to the Constitution of the United States. Although this Court in its Opinion in *Kirksey v. Board of Supervisors of Hinds County, Mississippi,* 402 F.Supp. 658 (S.D.Miss.1975), found that the effects of past discrimination were no longer present in Hinds County, the *en banc* Court of Appeals reversed, holding that the past discrimination precluded the effective participation of blacks in the electoral process in the absence of the defendants meeting their burden of coming forward with the evidence that enough of the incidents of the past had been removed, the effects of past denial of access dissipated, and that there was presently equality of access, because of "sweeping and pervasive" past intentional discrimination which was shown to have continued to within a few years of the present. *Kirksey v. Board of Supervisors, supra* at 144. *Nevett II, supra* at 222, fn. 26.

Since the commission form of government was adopted in 1912, no black candidate has been nominated in any party primary for a seat on the Jackson City Council, nor has any black candidate been elected to the Jackson City Council in at-large voting. It is true that the named plaintiff, Henry J. Kirksey, black independent candidate for governor, received a smaller percentage of the black vote in Jackson than did either his Republican or Democratic opponent, but this fact was very unusual and probably resulted from his limited campaign efforts, and/or his qualifications and personal popularity. All other elections involving black office seekers reflected that each received a very large percentage of the black votes cast but very few of the white votes in Jackson, the overwhelming percentage of the latter having been cast for white candidates with the exception of one legislative race in which over 3,000 white votes were cast for a black candidate in 1967. (See Exh. P–129).

Five black candidates sought seats on the Jackson City Council in the 1969 and 1973 municipal elections, and all were defeated. In addition, the referendum submitted to the electorate of Jackson for a change in the form of city government to a mayor-council form was defeated. The results of all these elections and the unsuccessful referendum were analyzed by Dr. Gordon G. Henderson, Professor of Political Science and Director of the Computer Center at Tougaloo College near Jackson, Mississippi. Based upon 1970 Census data, Dr. Henderson computed the racial composition of all the Jackson voting precincts, and then compensating for socio-economic status, used the election results and a computer program to perform both correlation analysis and regression analysis of the election returns by precinct. Correlation analysis is a process which shows the strength of the relationship between pairs of variables, using statistically significant variables which are stronger than other variables. Regression analysis is a process which singles out from a group of variables the independent

variable which best predicts values of the dependent variable, and thus can best explain the variance between the two. Stated another way, regression analysis is an accepted method of analyzing data to determine the extent of correlation between dependent and independent variables. The dependent variable was the vote received by the candidates studied, and race was the independent variable whose influence on the vote received was measured by the regression. The analysis reflected that race had a strong correlation with the vote received by a candidate; in other words there was strong evidence of racially polarized voting. The regression analysis showed that the best predictor of the votes received by the black and white candidates for municipal office was the racial composition of the population of the precincts, and other factors such as socio-economic status were never significant predictors of the voting patterns. In the 1973 municipal elections winning white candidates carried every one of the almost exclusively white precincts, and black candidates failed to receive a significant number of votes in those precincts. Conversely, each of the major black candidates for municipal office overwhelmingly carried all of the almost exclusively black precincts.

■ This Court agrees with Dr. Henderson's conclusions that there is a clear pattern of racially polarized voting in Jackson with whites voting overwhelmingly for white candidates for municipal office and blacks voting almost overwhelmingly for black candidates.

Blacks today have no problem in becoming candidates in a primary election and in a general election in the City of Jackson, as is evidenced by the fact that there have been quite a few black candidates for municipal office. Likewise, there are no impediments to blacks registering and voting in these elections. The plaintiffs concede that they have no evidence of blacks being currently discriminated against in the areas of voter registration, and offered very little, if any, evidence of any problem in getting on the ballot, which is the core of the slating inquiry.

As noted by the court in *Nevett II,* "[t]he success or failure of black candidates appears to depend not upon any barriers to access to the slating or registration stages of . . . [Jackson's] political processes, but upon racially polarized voting . . ." 571 F.2d at 227. Thus the Court finds that the plaintiffs have failed to prove any lack of access in the electoral process, either in slating, registering or voting in the City of Jackson.

## B. State Policy Concerning At-Large Districting of City Governments

■ A tenuous state policy in favor of at-large districting may constitute evidence that other, improper motivations lay behind the enactment or maintenance of the plan, and the absence of a significant and legitimate state policy behind districting provisions has been an important factor in several cases finding intentional discrimination.

■ Mississippi law permits a municipality to select one of several different forms of government. *See,* Miss.Code Ann. §§ 21–3–1, 21–5–1, 21–7–1, 21–9–1 (1972); Miss.Code Ann. § 21–8–1 (Supp. 1977). This is similar to the law referred to by the court in *Bolden* which resulted in the District Court's finding that the State of Alabama had no particular preference for an at-large scheme. The court in *Bolden* said it appreciated the traditional deference the federal courts have accorded local governments, and recognized "that viable local governments may need considerable flexibility in municipal arrangements if they are to meet changing societal needs. *Abate v. Mundt,* 403 U.S. 182, 185, 91 S.Ct. 1904, 1907, 29 L.Ed.2d 399 (1971)." 571 F.2d at 244. The *Bolden* court added that city-wide representation was a legitimate interest, and at-large districting was ordinarily an acceptable means of preserving that interest. See *Wise v. Lipscomb,* 434 U.S. 1329, 98 S.Ct. 15, 18, 54 L.Ed.2d 41 (1977), [recalling mandate and staying judgment of 551 F.2d 1043 (5th Cir. 1977)]. The Fifth Circuit nevertheless stated that the longevity of Mobile's at-large commission government

could not insulate it from judicial review when state power is used as an instrument for circumventing a federally protected right [citing *Gomillion v. Lightfoot,* 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (196)]. As in the case *sub judice,* the defendant city officials in *Bolden* had never suggested in their brief any legitimate municipal function which the at-large districting act is designed to serve. Although the court in *Nevett II* stated that "[even] though state statutes generally need satisfy only minimum rationality requirements . . . . the weight of the state policy behind the districting plan is an evidentiary consideration that must be considered along with all other relevant evidence to determine whether the plan is improperly motivated." 571 F.2d at 224. This Court finds that there is lacking herein sufficient interest in at-large districting to allow a finding that there is an extant state policy in favor of at-large districting of city government.

## C. The Effect of Past Discrimination on the Present Effective Participation in the Election System

The third factor which must be considered in determining whether black citizens' Fifteenth Amendment right to vote has been diluted is whether past discrimination in general precluded the effective participation in the election system by blacks, that is, whether past effects of discrimination have the effect of precluding effective participation in the election system by blacks today. The defendants have conceded a history of past discrimination against blacks in Mississippi and in Jackson. Prior to the passage of the Voting Rights Act of 1965, eligible black citizens in Mississippi were almost completely disenfranchised by the voting qualification requirements of the Mississippi Constitution of 1890 and subsequent legislation enacting literacy and constitutional interpretation tests for voter registration and by the poll tax requirement. See *Stewart v. Waller,* 404 F.Supp. 206, 214 (N.D.Miss.1975) (noting the "long history of statutory racial segregation and discrimination in Mississippi, with consequent token participation by blacks in the political processes of the state"); *Riddell v. National Democratic Party,* 344 F.Supp. 908, 912 (S.D.Miss.1972), *rev'd on other grounds,* 508 F.2d 770 (5th Cir. 1975) ("it is true that in the past Mississippi, [through] its laws, practices and customs as have other states has been guilty of racial discrimination").

In addition to past voting discrimination, racial discrimination and segregation was imposed in other areas of public life in Mississippi as well, including public schools, colleges and universities, public parks, waiting rooms, public places of amusement, recreation and assembly, public transportation and terminals, county and municipal jails and state prisons, and public hospitals and sanitariums. State officials were charged with the duty of maintaining segregation of the races. *U. S. v. State of Mississippi,* 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965).

After the passage of the Voting Rights Act of 1965, Federal registrars or examiners were dispatched to Hinds County to enforce the guarantees of the Fifteenth Amendment and to register voters to participate in both state and municipal elections. Of the 13,232 persons registered to vote in Hinds County by federal examiners, 8,683 (65.62%) were registered to vote in Jackson precincts.

The Jackson School Board, appointed by the Jackson City Council, long maintained a dual or racially segregated school system, see *Singleton v. Jackson Municipal Separate School District,* 509 F.2d 818 (5th Cir. 1975), and the city maintained racially segregated parks, auditoriums, golf courses, and swimming pools, most of which were not desegregated until successful federal litigation ensued.

This Court is mindful of the fact that it is not enough that the less subtle means of diminishing black participation have been removed inasmuch as discriminatory official action is often clandestine and politic. Furthermore, as the court in *Bolden* said:

Where, as here, past racial discrimination has been found to be pervasive and

recent, it must be demonstrated "that enough of the incidents of the past [have] been removed, and the effects of past denial of access dissipated, that there [is] presently equality of access." *Kirksey v. Board of Supervisors*, 554 F.2d 139, 144–45 (5th Cir.) (en banc) (footnote omitted), *cert. denied* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977).

571 F.2d at 245.

· This must be done by the defendants bearing the burden of coming forward with evidence that enough of the incidents of the past have been removed, the effects of past denial of access dissipated, and that there is presently equality of access. *Nevett II, supra* at 227, fn.26.

This Court finds that the defendants have met the burden cast upon them in *Kirksey*. Plaintiffs concede on page 11 of their post-trial Proposed Memorandum Opinion that there is no evidence that blacks are currently being discriminated against in voter registration; likewise, this Court finds in accordance with the testimony of Mrs. Evelyn Ballard, City Clerk of the City of Jackson for the past 13 years, that black registration has been in rapid ascendency since passage of the 1965 Voting Rights Act. The record is completely devoid of any evidence supportive of any present fear or reluctance or interference with the efforts of blacks to register, vote, or seek public office, and the turnout among black registered voters for the past several elections has not been such that would give rise to the inference of any fear or reluctance on their part to cast their ballots or to seek election to the Jackson City Commission or any other elective office in the City of Jackson or to vote on the referendum question submitted and defeated recently.

In addition, the Jackson Municipal School District is now a unitary, integrated system; there are no longer segregated terminal or transportation facilities; public facilities are fully integrated and no longer discriminate against blacks; and most, if not all, public facilities in the City of Jackson, are no longer racially segregated. Of course this Court takes judicial notice that

the foregoing ameliorative actions were effectuated by federal litigation, mostly through consent orders entered into following the institution of suit, most of which went far beyond the specific relief requested by the plaintiffs.

The failure of black candidates to win election in the past city elections has not resulted from preclusion of effective participation by blacks in the election system because of past discrimination.

### D. Responsiveness of City Officials to the Black Citizenry of Jackson

■ The fourth and last principal *Zimmer* factor or criterion which must be considered is whether the at-large elected mayor and two city commissioners of Jackson have been responsive to the needs of its black citizens. As noted by the Court of Appeals in *Bolden,* the District Court's task in considering evidence under the responsiveness criterion is a singularly factual one, and although not in itself determinative of dilution, nevertheless is of "momentous" importance. *Blacks United, Etc. v. City of Shreveport, supra,* at 254. The two distinct facets of this issue are (1) the extent and quality of municipal services to the neighborhoods populated by minority group members, and (2) a distribution to them of municipal jobs and appointments to various boards and commissions. *Hendrix v. Joseph,* 559 F.2d 1265, 1268–69 (5th Cir. 1977); *David v. Garrison, supra* at 923 (5th Cir. 1977). A concomitant of this is the equal treatment of blacks by city officials and various department heads and their staffs.

We are mindful of the fact that the plaintiffs have the burden of proving unresponsiveness, and that this Court's findings of fact on this sub-issue must also be thorough and detailed, rather than conclusory in nature. *See, Blacks United, Etc. v. City of Shreveport, supra.*

### 1. Appointments—Employment

With these well settled principles in mind, we consider first the question of whether the plaintiffs have proved by a preponderance of the evidence that the de-

fendants are guilty of discrimination in the dual and interrelated appointment-employment fields. It is undisputed that the final authority to make all such appointments and to hire employees rests with the mayor and two commissioners, each of the three having charge of various city departments or functions.

■ (a) Appointments. We recognize that in dealing with discretionary appointments, a court may not order that particular appointments be made, *Mayor of the City of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), and *James v. Wallace,* 533 F.2d 963 (5th Cir. 1976), nor do jobs need necessarily be allocated proportionately to every group in the electorate before a local governmental entity is deemed to be responsive. *Hendrix v. Joseph, supra* at 1269.

It is undisputed that prior to 1969 no blacks were appointed by the Jackson City Council to city boards, authorities, committees or commissions. At the time of the trial of this case, of the 35 appointive boards, authorities, committees or commissions whose members are appointed by the city council, 21 are all white (60%), and 13 have black members (40%). Of the 320 seats on these various boards, authorities, committees or commissions, 289 are filled by whites and 41 are filled by blacks (14%), with some few blacks serving on two or more committees. (Ballard testimony; Stipulation Ex. M-8). Two of the five member Board of Trustees of the Jackson Municipal Separate School District are blacks, which is unsatisfactory to the plaintiffs, inasmuch as 70% of the student enrollment in the school system is black. The number of appointments that may be made in any given length of time is limited due to the fact that the terms of the members thereof are staggered. One vacancy on the Board of Trustees occurred in 1977, and a black was appointed to fill that position. The first black was appointed to the City Planning Board in late 1971, and the second of the two present black members on that Board was appointed in 1974 when the board was expanded to 15 members. Both of the black members on the board are active, vocal and involved in Planning Board activities, and are thus very representative of the black citizenry. Although all members of the Jackson Zoning Commission are white, no black applied for membership to fill the vacancy in response to advertisement for a black member. The planning division of the Jackson Planning Authority consists of 16 members, ten of whom are white, five black and one Oriental. The Deputy Director of the Allied Service Department, which was a brainchild of the immediate past mayor, Russell Davis, and which has the responsibility for the overall supervision of programs for human resources, is David Miller, a black who has held this position since 1973 at a salary in excess of $14,000. In addition, the Vista coordinator of this department is black and makes in excess of $12,000 per year, and seven of the eight day-care center manager operators in this department are black and each makes in excess of $10,000 per year. The majority of these programs administered by this agency are federally funded with the City posting matching funds; however, the entire staff thereof, including the foregoing, are paid with city funds.

Recently the Jackson City Council created a new board known as The Arts Center and Planetarium Board, and appointed nine members to that board, one of whom is black.

■ Judge Reuben Anderson (who subsequent to the trial of this case has been appointed by the Governor to fill a vacancy in one of two County Court judgeships in Hinds County, formerly held by a white judge), a black lawyer, was at the time of the trial of this case serving as one of three City Court judges in Jackson pursuant to his appointment by the City Commission. Judge Anderson is the law partner of Fred L. Banks, Jr., who the Court takes judicial notice was recently appointed by the Governor to membership on the State Board of Bar Admissions. In addition Anderson served on a committee appointed by former Mayor Davis to investigate the Jackson

State University incident of some years ago and is a member of a committee appointed by newly-elected Mayor Dale Danks, Jr., together with another black lawyer, to review the operation of the municipal court system in Jackson for the purpose of improving the administration of justice in the city courts. Presently, two of the five members of the Jackson Housing Authority and one of the seven members of the Jackson Redevelopment Authority are blacks.

This Court is impressed by the affirmative steps taken by the officials of the City of Jackson since 1969 to obtain effective representation of black interests on various boards, authorities, commissions and committees in the city, clearly indicating that they are being appointed in increasing numbers by the elected city officials. This Court is therefore of the opinion that the plaintiffs have failed to prove by a preponderance of the evidence that the defendants are presently, or have since 1969 been unresponsive to the black citizenry in the appointment sphere of government.

(b) *Employment.* As previously noted, all hiring and promotion of municipal employees of the City of Jackson must be approved by the City Council (Mayor and two Commissioners).

In 1972 and 1973, black plaintiffs filed complaints in this Court against the City of Jackson charging racial discrimination in hiring, testing, promotions and other terms and conditions of employment in the Jackson Fire and Police Departments. *Bell v. City of Jackson,* Civ. No. 72J–153(C) (S.D. Miss.1973) (Fire Department); *Corley v. Jackson Police Department,* Civ. No. 73J–4(C) (S.D.Miss.1974). Discovery revealed the following facts which were stipulated as correct in the consent decrees subsequently entered into between the plaintiffs and the defendants in both of the above cases.

For the sixty-year period from its formation until 1971 no black person had been employed in the Jackson Fire Department until 1972, when the first black employee was hired. From 1972 to 1973 eighty-six blacks applied for positions in the Fire Department but only one was hired. Statistics stipulated as correct by the parties indicated that most black applicants were rejected for failing to make a passing score on the Civil Service Examination. Statistics showed that this test had an extremely discriminatory impact on black applicants and had never been validated for job-relatedness.

In the *Corley* case, it was shown that from the formation of the Police Department in 1885 until 1963 no blacks had been employed as sworn officers therein, the first having been employed in 1963. Despite the fact that Jackson was 39.17% black according to the 1970 Census, as of December, 1972, of the 302 sworn officers of the department, only 21 were black (6.95%), and none held the rank above that of sergeant with only one black officer having held that rank. Of the 318 black applicants who had applied to become a sworn police officer between 1970 and 1973, only 14 were hired. 87% of the black applicants during that period received failing scores on the Police Entrance Examination, which had a severe discriminatory impact on black applicants and which also had never been validated for job-relatedness. Additional statistics stipulated to by the parties showed under-representation of blacks among secretarial and clerical personnel, segregated job categories and disparities in promotional test scores and promotions between white and black applicants for promotions in the Police Department.

In 1974, the United States Department of Justice filed an action against Jackson charging a citywide pattern of practice of employment discrimination throughout the various departments of the city in violation Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., *United States v. City of Jackson,* Civ. No. J74–66(N) (S.D. Miss.1974). The city and the plaintiffs entered into consent decrees in all three of the foregoing cases agreeing to detailed injunctive relief designed to eliminate racial discrimination in all aspects of city employment. This relief included one-for-one quota hiring in all job classifications in which blacks were under-utilized and for sworn

officer positions in the police department, filling the first fifteen vacancies in the fire department with blacks and then hiring on a two for one (black-white) basis, one-for-one quota promotions in the police department, elimination of all tests and entrance examinations alleged to have a discriminatory impact unless and until properly validated, and also back pay for certain categories of employees.

On June 18, 1976, four rejected black applicants for Jackson police officer positions brought an action charging that the continued use by the department of the Minnesota Multiphasic Personality Inventory (MMPI), the psychological examination utilized to test applicants for police officer positions, violated the consent decrees entered in the above cases and their rights secured by Title VII of the Civil Rights Act of 1964. *Grizzell v. Jackson Police Department,* Civ. No. J76-190(R) (filed in this Court on June 18, 1976 and still pending). In their Answer to the Complaint filed in that action, the defendants admitted that from March, 1974 to December, 1975 the passing rate of white applicants had been 59% (444 applicants) and that of black applicants had been 33.3% (273 applicants); that the MMPI is a test within the definition of the EEOC's Guidelines or Employee Selection Procedures; and that the City had failed to conduct any validation studies to demonstrate a significant relationship between satisfactory performance on the MMPI and successful job performance.

Although the defendants concede that the percentage of black employees does not equate the percentage of black population of the City of Jackson, and do not deny that the above three employment discrimination suits have "produced results", as is conceded by the plaintiffs, they nevertheless point out that the city did voluntarily enter into consent decrees in each of the above three cases and that these consent decrees have produced a dramatically favorable hiring-increase of blacks. The city council adopted an affirmative action program to aid in obtaining an increase in the number of black city employees. In addition, other significant steps taken by the city included the formal adoption of a policy of equal employment opportunity (Exhs. D-6 and 7), the adoption of a formal promotion policy (Exh. D-8), and the employment by the city of a fulltime Affirmative Action Coordinator, who prior to his employment by Jackson, was a chief investigator for the United States Equal Employment Opportunity Commission in Jackson. This man also helped write the Affirmative Action Program for the City applying to all aspects of employment, and going beyond the requirements of the consent decrees entered into in the above cases which also were slated to be updated in July, 1977.

This program consisted of posting vacancy announcements on all bulletin boards in the city departments as well as sending them to minority groups. Additionally, department heads and the City Councilmen are informed of who is hired, including their race. All applicants are permitted to compete, and no favoritism in hiring or promotion is permitted under the program. The recruitment effort also included bringing blacks into managerial positions (Exhs. D-8, 9, and 10).

Between January, 1970 and March, 1977 the black percentage of the total work force in Jackson increased from 33.2% to 39.3%; the percentage of blacks in monthly positions increased from 2.5% to 23.1%; and 71.2% of the increased monthly positions (378 of 531) were filled by blacks. As of June, 1977, the city had 2398 employees on its payroll, which included 977 blacks, or 40%; 1,795 monthly civil service positions above laboring class, of which 451 or 25% were blacks compared to 2.5% blacks in non-laboring classes in 1970, showing a dramatic increase and evidencing a much more favorable condition than that which existed in the city of Milwaukee, Wisconsin, by way of example.

Admittedly, most of the black employees are concentrated in the laborer and unskilled laborer positions, and of the 78 Jackson city employees earning above $13,000 per year, only one was black; however, several were earning $10,000 to $12,000 per

year. The evidence reveals the following results of the Affirmative Action hiring program instituted and implemented by the City of Jackson in recent years. Sixteen of the twenty-five employees on the staff of the Jackson Housing Authority are blacks, and two of eleven members of the staff of the Jackson Redevelopment Authority are blacks, one being the Financial Counsellor and the other the Property Improvement Inspector. Three of the nine employees in the City Clerk's office are blacks, and two of them have regular contact with those who come into the City Clerk's office for voting registration and other matters. There are six foremen in the Public Works Department of the city who make regular inspections of streets in response to requests for repaving or repairs and out of these, two are whites and four are blacks. There foremen are assigned to separate areas and reassigned periodically to other areas, and report to the coordinator who then makes a personal inspection. It is his report, in conjunction with the foremen's report, which determines which streets in the city will be resurfaced or repaired, subject to the final approval of the City Council.

Plaintiffs offered no proof that whites were hired to fill any job position with the City of Jackson ahead of or instead of any qualified black applicant therefor or that any qualified black applicant was denied employment by the City of Jackson in the last several years.

This Court finds that the plaintiffs have failed to meet their burden of proving any job discrimination against blacks by the City of Jackson in the last four to five years. On the contrary, the Court is impressed with the Affirmative Action Program adopted and being effectively implemented by the City, which has produced dramatically increased hiring of black citizens to more responsible positions. This program is being updated with records maintained and which and has, as conceded by the plaintiffs, "produced results."

2. Particular Municipal Services

The plaintiffs' complaint of discrimination against them in connection with the furnishing of municipal service generated the greatest quantity of evidence adduced during the trial of this case, and in particular the most evidence on the part of the defendants. The plaintiffs charge that the black citizens of Jackson have been denied equal protection because they have not been afforded municipal service comparable to those accorded the white citizenry. Their complaints relate to almost every, if not every, aspect of municipal services rendered by the city to its inhabitants, namely planning, street maintenance, storm drainage, sewerage facilities, zoning, street layout, street lighting, parks and other recreational facilities, location of bikeways, water available for fire protection, health care, police protection and consideration or courtesy. The defendants categorically deny each and every one of the foregoing allegations of discrimination and contend that in order to properly evaluate the effectiveness of Jackson's Commission-type government it is necessary for the Court to scrutinize the delivery of particular services to both the black and white communities, and consider each service in detail with respect to each service complained of. This is the approach the defendants contend was not taken by the District Courts in *Bolden v. City of Mobile*, 423 F.Supp. 384 (S.D.Ala. 1976), and *Blacks United for Lasting Leadership, Inc. v. City of Shreveport*, 71 F.R.D. 623 (W.D.La.1976).

(a) *City Planning.* The City of Jackson did not initiate city planning until the mid 1960's, and the adoption of plans was not brought into focus until the city administration took steps toward acquiring federal funds in about 1969, at which time Jackson found itself in the position of being unable to provide various plans that federal agencies expected a community of that size to have already formulated. A comprehensive plan was developed in element sections in the form of a series of individual or subject reports, many of which have been introduced into evidence by both plaintiffs and defendants. These reports indicate that they constituted a concerted effort to im-

prove the quality of life for all Jacksonians, black and white, and recognized that greater needs did exist in the lower income and minority areas in the city and accordingly assigned the first priority to improved services in those areas. The plaintiffs contend that the defendants discriminated in this area by failing to seek black participation in the city's development goals, pointing specifically to a "community goals survey" which was performed under private contract for the City Planning Department in 1970 reflecting that of 110 persons interviewed in the survey only 9 were blacks, predictably resulting in exceedingly low priority of black needs and goals, among which were appointment of minorities to committees, low income housing, public schools, equal employment opportunity, improvement of slums, and public health facilities.

It is evident that Mr. Donald Irvin, the City Planning Director, considered this survey to be "superficial," and indicated by his letter of transmittal to the Planning Board, with a copy to the City Council for informational purposes only, with no subsequent adoption or endorsement of it by the City. (Exh.: D–73, Vol. 1, at p. 45). A previous survey taken in 1969 of the "recreational needs of senior citizens" (Exh. P–79) was based on interviews of 35.9% non-white persons, and 64.1% whites, and was taken by nine interviewers, three of whom were black retired educators, the remaining six being staff personnel in the Planning Department. That survey led to the funding of two senior citizen centers, one on Jayne Street which was formerly predominantly white, but now is in a transitional stage of mixed white and black, and the other in the College Park area which is predominantly black. (Exh. P–73, Vol. 2 at p. 145).

The Planning Board developed a Community Facilities Plan for parks, recreation and open space (Exh. P–75), libraries, (P–76) and municipal fire protection (Exh. P–77). Each of these reports was presented to the City Council together with one concerning future land use, upon recommendation by the City Planning Board, and a public hearing was held on this subject, after which they were adopted as the city's policy

in those areas. (Exh. D–73, Vol. I at p. 29). They presented in-depth analysis of existing facilities and identification of problem areas and community needs and recommended actions to alleviate the problems. Once the city had developed the general community-wide plans, it then turned toward development of plans in more depth in specific or smaller areas.

In October of 1974, the City Planning Board issued a "neighborhood analysis summary", which was a report intended to establish a format to accomplish a specific analysis "to identify problems which occur on a small area basis, to determine the incidents of these problems in terms of neighborhoods and to design a program that would assist in that area." (Exh. P–65). At that time the Planning Board issued a report titled "Neighborhood Analysis Supplement—a Quality of Life Index," (Exh. P–69) which was designed for use in evaluating the quality of life in particular neighborhoods.

The Planning Commission then adopted a Neighborhood Development Planning Program (Exh. P–94), under which the city was divided into 86 neighborhood units, with the older inter-city neighborhoods being the initial subjects of study and planning; that is, the Board planned to begin its work in the older inter-city neighborhoods and gradually work in concentric circles out from the inter-city, eventually concluding with the peripheral neighborhoods, which are in most cases the newer developed areas of the city. The first neighborhood study to be completed was the Jackson State University area, a predominantly black neighborhood (Exh. P–95).

Other methods used to obtain black input into the operation and planning of the city government were a biracial Citizens' Advisory Committee which for several years had discussed and provided reports on important issues which had arisen in Jackson. Following the enactment of the Housing and Community Development Act of 1974, several blacks were appointed by the City Council to this committee, which was to serve as a

type of clearing house for citizens' ideas, an advocate of their needs, and a stimulus for action when necessary to achieve the goals of the Housing and Community Development Act of 1974. (Exh. P–116). The City's Housing and Community Development Participation Plan established to implement use of the federal funds to be received under the Act, also included "town hall meetings" and meetings with citizens groups in churches and neighborhood community centers to discuss the Act and encourage citizen involvement in establishing priority for the use of the federal funds.

Jackson's Federal Programs Department has conducted two meetings a year at City Hall since the program started three years ago for the purpose of discussing the Act and use of funds by the City. (Exh. D–81 at pp. 14–15, 18). In addition, since its establishment in 1974 the Department has also held a number of neighborhood meetings throughout the City in order to gain citizen input, and most, if not all, of these meetings have been held in the predominantly black areas of the city. Approximately 14 neighborhood meetings have been held, and almost all of the proposed projects for inclusion in the application for Community Development funds from 1975 to 1977 were derived from these neighborhood meetings. These projects include code enforcement grants, day care services, Jackson State University improvements, alleviation of Town Creek flooding, senior citizen centers and the renovation of Jones Community Center. Based upon the foregoing, this Court finds that the plaintiffs have failed to meet their burden of proving discrimination against blacks in the area of city planning; instead, the evidence shows increasing utilization of black citizens' input in planning for the development of the city and in establishing priority for the use of federal funds for that purpose.

(b) *Zoning.* The plaintiffs contend that the defendants have discriminated against blacks by miszoning black residential areas. More specifically, they charge that there are certain black residential areas in the city where zoning is not used to protect residential properties to the extent that it is utilized in white areas, inasmuch as industrial uses are permitted in a high percentage of land in black residential areas which are zoned commercial or industrial, whereas many predominantly white areas are zoned residential. They complain that this miszoning affects the quality of life, decreases the property values and increases the cost of upkeep.

The City adopted its first Zoning Ordinance on April 16, 1929, and it remained in effect until superceded by the present Zoning Ordinance which was adopted on May 29, 1974 (Exh. P–66). The 1929 ordinances were of a cumulative type, permitting residential development in industrial zone areas, resulting in the non-conforming structure being the residential, not the industrial. This is not permitted under the current 1974 ordinance.

In addition to prohibitive costs and other problems associated with any wholesale attempt by the city to rezone commercial or industrial property to residential, other legal requirements must be met as a prerequisite pending a municipality amending its zoning ordinance. Before rezoning, it must be shown that there was some mistake in the original zoning or that conditions in the neighborhood have changed so as to warrant rezoning. *Underwood v. City of Jackson*, 300 So.2d 442 (Miss.1974). The Mississippi Supreme Court has recently held in the *City of Jackson v. Shell Oil Co.*, 347 So.2d 340, (Miss.1977) that when the 1974 Comprehensive Zoning Ordinance was adopted changing the zoning status of Shell's property, the doctrine of res judicata applied, that is, when Shell filed a timely petition to maintain the status of its property, the City had no authority to change it absent a material change in circumstances occurring since it was last zoned.

Jackson has rezoned several areas near Jackson State University and in the Albemarle Street area, both predominantly black areas, from industrial to residential because of the fact that they were predominantly residential. Future industrial development would be located in areas designat-

ed for such use within the zoning ordinance based upon the City's adopted future use plan.

This Court therefore finds from the evidence that the City has not purposely or intentionally discriminated against blacks in the area of zoning, and thus the plaintiffs have failed to meet their burden of proving any such discrimination.

(c) *Street Resurfacing or Repairs.* The plaintiffs charge that the City of Jackson has discriminated against blacks in the area of services which encompasses street and sidewalk construction and maintenance, contending that there has been discrimination in the area of resurfacing of streets, connecting streets across creeks, paving and street width. No evidence was offered by the plaintiffs to substantiate any claim of discrimination as to street construction or the construction or maintenance of sidewalks, but all of their evidence dealt with alleged discrimination in the maintenance and paving of streets, street width, and connecting of streets across creeks which divide predominantly white and black neighborhoods.

In support of these contentions, the plaintiffs relied upon the testimony of Mr. James P. Dahlberg, a twenty-seven year old municipal services consultant for the Lawyers Committee for Civil Rights in Jackson who worked for fourteen months in the Government Services Equalization Center in Washington, D.C., but who was not a member of any professional society, had no formal education in engineering and urban planning, accounting or city government and who has completed one year of law school.

The witness testified that pursuant to Jackson's street resurfacing program which began in 1973 only 25 (15%) of the 175 miles of streets resurfaced were located in the 48 contiguous majority black census enumeration districts where 94% of the black population of Jackson resides; that since approximately 27% of Jackson's residential streets are located in this area, blacks have received little more than half their entitlement under this program. He concluded that this disparity can be explained only on

the basis of race since there is a greater concentration of industrial use in black areas and flooding conditions which may cause street deterioration are well documented in black areas of the city. Mr. Dahlberg further testified that an examination of street resurfacing on a year-by-year basis shows a pattern of underservice in black areas for each year and concluded that the black area was underserved and the white area overserved solely on statistical evidence without regard to the actual conditions of streets in either area.

The procedure followed by the City of Jackson in determining which of its streets should be resurfaced was explained by Mr. Jack Oldfield, City Engineer and Director of the Public Works Department. A record is made of all complaints received concerning street maintenance, and six foremen, including four blacks and two whites, who rotate the areas of the City to be inspected, inspect the streets which are the subject of the complaints and submit lists of streets which need resurfacing to the Public Works Coordinator, a white, who decides which streets are to be resurfaced and the priority that should be accorded, with the final decision being made by the City Commission. The decision regarding which streets are to be resurfaced is based on the condition of the street, and not on the basis of race. This Court finds that the area of the city with the worst street conditions are the outlying or newer areas of the city which are predominantly white residential sections, and that these conditions are attributable to soil conditions, the destruction caused by heavy trucks working in subdivisions, and substandard construction by developers prior to annexation.

Mr. Dahlberg's analysis is based upon the City's data which revealed that 24% of total street resurfacing for the period 1973 to 1977 was performed in predominantly black residential areas. The statistical evidence of street resurfacing in black areas compared with that in white areas is not convincing inasmuch as the City clearly demonstrated that street resurfacing has been accomplished on the basis of need and not on

the basis of race. Thus the Court finds that the City has not discriminated against blacks with reference to street resurfacing or repair.

The plaintiffs also complain of "breaks" in some streets between black and white neighborhoods, that is, discontinuation of a street for twenty to fifty feet between predominantly a black and a white neighborhood without any apparent physical reason; they further charge that the above situation exists with reference to some streets when a small creek is encountered, which would be used as a means to perpetuate racial segregation. The plaintiffs contend that the street interruptions foster neighborhood racial segregation and in the case of blacks, racial isolation and stigmatism, in addition to inhibiting normal vehicular mobility. Mr. Dahlberg was the only witness offered to support this complaint by the plaintiffs. Mr. Oldfield testified for the defendants that he examined these areas and found blacks living on both sides of the creeks and that there were also areas in the white section of Jackson where streets stopped at the edge of creeks without bridging. He explained that under the present subdivision ordinance (Exh. D–63) that the City of Jackson could not require a developer to connect streets on the opposite side of creeks; however, under a recently adopted subdivision ordinance (Exh. D–64) which became effective on July 30, 1977, the City can now require developers to connect these streets. This Court finds that the credible evidence does not support the foregoing complaints.

(d) *Unpaved Streets.* Plaintiffs also charge that the defendants have discriminated against blacks by failing to pave streets in predominantly black neighborhoods to the same extent that they have in predominantly white neighborhoods. Mr. Dahlberg alluded to this fact in his testimony, although his written report, (Exh. P–137) failed to mention this subject. Dr. Loewen in his deposition testimony also testified to some extent concerning unpaved streets in black neighborhoods, and specifically testified that he found thirty additional unpaved streets that were not on the City's list of remaining unpaved streets in the City of Jackson (Exh. P–36, p. 25).

There are approximately 850 miles of streets in the City of Jackson, and less than three miles of unpaved streets remained prior to the 1976 annexation (Exh. D–82 at p. 27). A list of remaining unpaved streets in Jackson is found in Exh. D–7 to Mr. Oldfield's above deposition, divided into four categories. Category A contains 15 streets which were to be paved in Project No. 272 but were protested out by the property owners; Category B includes three streets which were not paved because of the Town Creek flooding caused by increases in the Pearl River water level; Category C includes eight streets which were to be paved in Project 271 but were also protested out by the property owners; and Category D includes two streets that were apparently overlooked during the survey that was made by city employees in 1974 when all unpaved streets were ordered paved (Exh. D–82, pp. 28–29). Jack Oldfield, Jackson's Public Works Director and City Engineer, investigated the thirty additional unpaved streets that were found by Dr. Loewen not to be on the City's list, and allegedly in predominantly black neighborhoods, and found that twenty of them were not dedicated for public use, but were private streets; eight had been dedicated for a right-of-way but were neither constructed by the developer nor opened by the City and some of these had rights-of-way dedicated on only one side or were not of sufficient width to pave; one street was already paved but was protested out by the property owners; and the property owners had curbs and gutters installed on the sides of the one remaining street but would not pay for the paving. Therefore, the City refused to pave the street because all citizens, black and white, are required to pay by special assessment for paving.

In view of the foregoing facts and the additional fact that the City Council had ordered that all unpaved streets be paved some time ago, subject to the property owners paying for the paving thereof, this Court finds that there has been no "street

paving discrimination" against the black citizenry of Jackson.

(e) *Street width.* The last complaint made by the plaintiffs with reference to street conditions relates to the width of streets in black vis-a-vis white neighborhoods. The plaintiffs' witness, Dr. Loewen, testified that based upon the survey he caused to be conducted streets in the black sections of Jackson are narrower than those in the white sections, that is, with a mean width of 29 feet in black areas and 41 feet in white areas, and that many streets in black areas did not have curbs or gutters. He did admit on cross examination that there were some streets in white areas without curbs and gutters also. Under the City's subdivision ordinance adopted in 1962 and effective until July 30, 1977, (Exh. D-63), before the City would accept the responsibility of maintaining a subdivision street, the street, if built with curb and gutter, had to have a minimum width of 32 feet, and if built without curb and gutter, a minimum width of 30 feet (22 feet plus a one foot gravel and 3 foot shoulder on each side). Consequently, a street, whether it be in the white or black section of Jackson with a width of 29 feet without curb and gutter from one edge of pavement to the other, actually exceeded the City's minimum feet width for the period from 1962 until July 30, 1977 by at least seven feet. Jackson's subdivision ordinance set forth minimum, not maximum street width standards, and if a developer constructed streets of a greater width than the minimum in a white area this does not in any way indicate that the City has discriminated against blacks. There is no evidence at all to indicate that the width of streets in the City of Jackson resulted from intentional discrimination against black residents of Jackson.

Many of the predominantly black neighborhoods are located in the older section of Jackson, some of which were formerly white areas, and many of the streets therein were constructed many years ago accounting for their being narrower than those recently constructed in the newer outlying sections of the city which are predominantly white neighborhoods. This Court finds that the plaintiffs have utterly failed to sustain their burden of proof that the defendants are guilty of discrimination against black with regard to the width of streets.

(f) *Street Lighting.* The plaintiffs contend that a 1975 study (Exh. P-83) by the Jackson Planning Board shows that an estimated 90% of streets in majority black census enumeration districts have inadequate lighting (Exh. P-136); and although they state that commendably the City adopted recommendations contained in the 1975 study for upgrading street lighting, unfortunately the implementation schedule which would have provided for the upgrading of the black area first was not followed, but instead extensive work was done in lower priority white areas while two of the three high priority black areas were skipped.

The City counters with the contention that the report prepared by the plaintiffs' witness, Dahlberg, correctly states that "a substantial majority of the total streets with inadequate lighting are located in black areas," but states that two factors are not reflected by the Dahlberg report, namely, that Map 2 of the study which indicates the level of street lighting and foot candles as of the Spring, 1975 reveals that the existing levels in black and white areas was roughly equivalent in terms of actual candlepower but that lighting in black areas was deemed inadequate for a variety of other reasons: higher crime, more pedestrian or vehicular traffic, more hazardous traffic conditions, or lack of emphasis on a certain area.

In addition, the Dahlberg report does not mention the implementation of a phase program to upgrade street lighting. The highest priorities of the program have been assigned to black areas (Exh. P-83, pp. 34-36) and work on Phase I in the vicinity of Jackson State University, a predominantly black residential area, was approximately 60% complete at the time of the trial of this case, and Phases II and III, also in black areas, have anticipated completion dates of 1977. Thus, in light of the above affirma-

tive steps to correct apparent deficiencies in the street lighting system, a finding of discrimination against blacks in the provision of this service is simply not warranted.

(g) *Bikeways.* Jackson is currently implementing a bikeways system plan developed by its Planning Board in 1974, which consists of 13 miles of bike trails constructed for the exclusive use of cyclists in addition to 108 miles of bikeways (Exh. P–80). According to the testimony and report of the plaintiffs' witness Dahlberg (Exh. P–139), blacks are underserved in the provision of bikeways inasmuch as none of the 13 miles of trails for the exclusive use of cyclists is located in black areas and only roughly 20 miles of the 108 miles of bikeways are located in predominantly black areas. There is no question that a majority of the bikeways are located in predominantly white areas, most of which are located along city streets and through vacant lands.

The plan recites that "the objective of the bikeway planning process is to minimize conflicts between the bicycle and the automobile by allotting sufficient space to each." (Exh. P–80 at p. 15). Location of the bikeways is determined principally by the engineering design standards set forth in the plan which provides that the system as a whole should form a continuous unbroken way which connects all significant bicycle trip origins and destinations throughout the urban area. Because of the cost question, street related locations must be chosen, and in doing so consideration must be given to traffic volumes, the presence of vehicles, including trucks, accident history, bus stops, pedestrian usage, uses, grade profile and pavement conditions.

The absence of more bikeways in predominantly black areas or neighborhoods located near the business district of downtown Jackson is due to factors such as population density and high traffic volume, inasmuch as protection of cyclists is extremely important. Any disparity between the linear footage and location of these bike trails in predominantly black and predominantly white areas is certainly not attributable to any purposeful racial discrimination.

(h) *Storm Water Drainage.* There is no question but that flooding in predominantly black communities is and has been a vexatious problem in the City of Jackson, particularly in the Town Creek area, but flooding is quite widespread in the City of Jackson and also affects the various predominantly white areas. A study by the engineering firm of Clark, Dietz and Associates made on behalf of the City of Jackson (Exh. P–57) recognized this Town Creek flooding problem and recommended a Phase program of improvements. Consequently, the City has applied for and received federal monies to assist in correcting the problem.

The map prepared by the plaintiffs' witness Dahlberg reflects the rising incidence of flooding in predominantly black areas or neighborhoods. The information from which the map was prepared was used in conjunction with the City's application for federal funds to be used in that particular area and did not constitute a compilation of all areas with a rising incidence of flooding. Mr. Dahlberg admitted on cross examination that he did not intend to convey the idea that there is more flooding in predominantly black, as opposed to white areas and that his report did not relate to discrimination against blacks in connection with this flooding problem.

Furthermore, funds were allocated in community development block grants to improve drainage structures along Town Creek in the predominantly black area by placing box culverts at an approximate cost of $165,000, which is approximately 85% complete; the placement of box culverts on Town Creek at Bell Street and Pleasant Avenue at the cost of $200,000, which was 45% complete; and the allotment of $500,000 for channel improvements of Town Creek, replacement of Gallatin St. Bridge and channel improvements on Town Creek between Gallatin and Fortification Streets. (Exhs. D–24; D–82 at pp. 48–52.)

The City of Jackson also obtained money through HUD under the so-called Categorical Grants Program in the initial phase of Urban Renewal to undertake the Town Creek Tube Project designed to alleviate

flooding in the Town Creek Area. After this project got underway the City was required by the federal government to continue the project in order to protect the federal government's financial expenditure and has done so by pledging community development block grant funds. Contrary to the plaintiffs' contention that this Town Creek Tube Project will benefit only the downtown business community, this Court finds that the improvement of storm drainage in the downtown area will also improve conditions in the black residential area along Town Creek just north of the business district and also that black, as well as white, business establishments will benefit thereby.

In sum, the City government has recognized the flooding problems which exist in the City of Jackson caused by heavy rains, which is not restricted to the predominantly black area but certainly does affect it, and has taken and is continuing to take affirmative steps to alleviate this problem. Therefore, this Court finds no evidence of discrimination against black citizenry by the City government either in the recognition of the flooding problem or efforts to alleviate it, which is being done as rapidly as feasible.

(i) *Sanitary Sewerage.* It is conceded by the defendants that sanitary sewage problems do exist in the Town Creek and Lynch Creek Drainage Basins located in the predominantly black residential area in the center of Jackson. The evidence shows that sewage conditions are worse in this area than in several other basins in the City of Jackson. The City's Sanitary Engineer testified that poor materials, narrow sewerage mains and infiltration/inflow problems are causing health problems in this area, including the pollution of Town Creek with raw sewage (Exh. P–42).

A study of the area-wide sewerage system was conducted in 1973 by Clark-Deitz and Associates (Exh. D–59), and this study resulted in a system of priorities for sewer improvement completions. A program was immediately implemented to rectify these deficiencies which necessarily required a considerable period of time because of the formulation of final plans, approval by the Environmental Protection Agency, the obtaining of available funds, the advertisement for bids and the awarding of contracts based thereon. This sewerage problem exists in the above areas as well as in practically all, if not all, of the old sections of the City.

The first project to be undertaken was the laying of a segment of sewer lines from Palmyra Street to Ford Avenue along Town Creek in the predominantly black area because this area presented the most serious problem. The City Council has committed itself to undertake all four projects recommended by the Clark-Deitz and Associates study for the Town Creek Basin Area plus two others (Exh. D–71, pp. 44–45).

In conclusion, the sewerage problems exist in various white and black communities in Jackson, but more so in the black community because of the fact that it is located in the older section of the city with understandably more problems, but this need has been recognized by the City and positive steps have been taken to rectify these inadequacies with priority being assigned to the alleviation of the problems in the black areas, which is underway at this time. This recognition and action on the part of the city is certainly the antithesis of apathy or discrimination against blacks.

(j) *Fire Protection.* The plaintiffs' allegation of inadequate fire protection afforded to black areas by the City is based primarily on the 1973 engineering report prepared for the City on the "Water Facilities Planning Analysis for the City of Jackson", which showed deficiencies in water pressure for fire protection in black areas, notably in the Mayes and Britton Avenue areas (Exh. P–81, pp. 32–35). They further contend that municipal fire protection in the black community is inferior to that afforded the white community, although they do concede that the City has made some effort to correct these deficiencies but complain that no update of the 1973 report has been performed to determine if they continue to exist.

The finding of one study has been that Jackson has a very good fire rating (Class 3) given by the American Insurance Association which reflects very good and satisfactory conditions in the six aspects rated for fire protection: water supply, fire department, fire alarm, fire prevention, building department and structural conditions in the high value district of the community. The two most important elements, water supply and fire department, and desirable situation allowing maximum use of the facilities of each, were found to exist (Exh. P–56 at III(74)).

The Jackson City Planning Board Study (Exh. P–74) reflects that "within the older developed portions of the City of Jackson, high risk areas, the community is well served by fire companies." The deficient areas noted in this report are "at the edges of the municipality and in the unincorporated portions, especially in the newer developed area." These three areas specifically enumerated as underserved are the northeastern portion of the study area (predominantly white), the Van Winkle area in west Jackson (predominantly black), and the Forest Hill area southwest of Jackson (predominantly white).

A map introduced into evidence by the defendants depicts the current location of fire stations and engine company coverage and updates Map 5 of Plaintiffs' Exh. P–77. This map reflects that the predominantly black areas of Jackson have greater overlapping areas than the white areas, most being served by at least two and sometimes three fire stations. Jackson's recent Capital Improvements Plan indicates substantial commitment of funds from revenue sharing funds and general obligation bonds for fire protection projects (Exh.' P–87, p. 14); (Exhs. P–85, p. 20; P–86, p. 17; P–87, p. 14).

Turning next to the fire flow aspect of fire protection, plaintiffs rely principally upon Analyses 3 and 8 of the Water Facilities Planning Analysis for the City of Jackson dated July, 1973 (Exh. P–81) which evidenced a deficiency in fire flow in certain predominantly black areas. These deficiencies were ascertained through computer simulation, and the analysis recommended the implementation of a phase program to correct the apparent deficiencies, which is currently being undertaken by the City, most of which have already been corrected, in accordance with the analysis recommendation.

The evidence preponderates in favor of the defendants concerning fire protection both through location of fire stations and firefighting equipment as well as fire waterflow.

(k) *Parks and Other Recreational Facilities.* Probably the most keenly disputed of the plaintiffs' public service discrimination claims relates to the number and location of public parks. Certainly the greatest quantity of evidence relating to public services was offered on this subject, by both plaintiffs and defendants.

Mr. Dahlberg's testimony was not based upon any personal inspection by him, but on a 1971 report of the City (Exhs. P–137 and P–75). He testified that the foregoing report reflects that 171 acres are allotted to black areas or neighborhoods for parks while white areas enjoyed a minimum of 1500 acres, and that over 1800 acres of vacant or marginal land in predominantly black areas could be acquired for parks; furthermore, newly annexed areas adjacent to areas of black residential concentration in the northwest part of Jackson could provide thousands of acres of park lands within black majority census enumeration districts.

On the other hand, defendants' evidence showed that the greatest concentration of neighborhood park facilities exists in predominantly black areas, and that when total acreage is broken down in a black/white community manner, 169 acres of parks exist in predominantly black areas and 143 acres of parks in predominantly white areas and 2,892 additional acres exist as community parks. In addition, planning by the city for parks has given the highest priority to neighborhood and district parks, with the highest priority for development being in predominantly black neighborhoods. (Exh. P–75 at pp. 4, 5, Maps 15–18).

The parties disagree on what should be defined as a "neighborhood park" and what should be designated "community parks." Plaintiffs contend that although testimony of Mr. Monroe Williams, the city's Parks Director, was that more than half of the neighborhood park acreage in Jackson is located in predominantly black areas and that some predominantly white residential areas are lacking neighborhood park facilities, nevertheless eight of the eighteen parks in black neighborhoods are less than three acres in size, while only one of the fourteen in white neighborhoods is less than three acres in size. The defendants counter that there is no *de jure* impediment to the use of community-wide facilities by blacks and whites. In answer to the plaintiff's allegation that the location of the new Riverside Park located off I–55 Highway is so far from black neighborhoods to discourage black utilization of the park, the defendants contend that it is not within walking distance of either white or black residents.

Based upon all of the evidence of record, this Court finds that factors other than race have influenced the location of city parks, and that there are sufficient and adequate neighborhood parks in and near the predominantly black residential areas of Jackson as well as community-wide parks which are available for use and are being used and enjoyed by all residents of the city. The Court finds that there are adequate parks to provide parks and recreational facilities to blacks and whites alike. Factors which have influenced the location of parks have not been race, but are existing land use patterns, density in housing types and financial ability to pay for facilities, as well as the topography and physiographic features of the land in question.

The City of Jackson has expended a great amount of funds to upgrade the quality of parks and recreational facilities provided both the black and white communities through the purchase of playground equipment, building of baseball fields, resurfacing and lighting of tennis courts, multipurpose centers with recreation, library and health facilities, summer supervised playgrounds and swimming pools. Jackson operates a ten week program of 50 summer supervised playgrounds, 39 of which accommodate black or predominantly black participants, and free lunches are served only at those 39 sites. (Exh. D–60). In addition, even though Jackson is not required to operate swimming pools, see *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), nevertheless it does operate several, five of which are located in predominantly black areas, two in predominantly white areas and three in areas which are considered community mixed areas. There is no prohibition against any person using any of these pools, regardless of race.

Plaintiffs offered considerable testimony as well as a documentary on Grove Park located in a predominantly black area of Jackson, which evidenced deteriorated facilities and equipment. However, the city has made substantial efforts to upgrade the quality of facilities located there since 1970, including the construction of a Little League baseball field at the cost of $17,000, resurfacing and lighting of tennis courts at a cost of $46,500, the acquisition of land for swimming pool construction at a cost of $264,928 and construction of a swimming pool which cost approximately $149,000. (Exh. D–22 and D–30). In addition, capital improvement projects for Grove Park at a cost of $175,000 to be funded by general obligation bonds, is also scheduled and includes the construction of a football field and shelter, as well as additional playground equipment and picnic tables. The Jackson City Council on May 25, 1977 also approved Grove Park as a location of a new multi-purpose community center, as well as centers to be located at Sheppard Brothers Park in a predominantly black area and Sykes Park in a predominantly white area. (Exhs. P–86 at A–28; P–87 at A–40; P–73 Vol. II at 54).

Unquestionably, the gravel access road to Grove Park was in a terrible state of repair, which led to a citizens' meeting at Jones' Center on January 11, 1977, producing a recommendation for reconstruction of the access road to Grove Park clubhouse because "the present road was unpaved and a

hazard to motorists, particularly in inclement weather conditions." The city included a $15,000 request for the reconstruction of the Grove Park road in its 1977 Community Development Block Grant Application to HUD (Exh. P–122).

The evidence fails to preponderate in favor of the claim of the plaintiffs that the defendants have discriminated against blacks in this area, considering all of the evidence in connection with parks and other recreational facilities and equipment constructed and maintained by the city for its citizens. On the contrary, the past and present conduct by, and the projects of the city do not show any insensitivity to the needs of the black community in the parks and recreational field, and the conduct of the city clearly evidences concern for the recreational needs of all citizens of Jackson, with the assignment of first priorities to neighborhood and area parks to be located in predominantly black areas.

*(1) Federal Programs.* Not until 1969 did Jackson participate in federal programs, and this came about after the election of Mayor Russell Davis, who was principally responsible for the city participating in various federal programs designed to aid low and moderate income areas. The city appointed a Federal Programs Coordinator and since 1970 has obtained approximately $17,000,000 in federal funds for neighborhood improvement projects, the great majority of which have been expended in predominantly black areas of the city. (Exh. D–82 and P–5). These funds have provided park and recreational facilities, reconstruction of storm drainage structures, reconstruction of streets, housing rehabilitation, senior citizen facilities, construction of a pedestrian walkway over railroad tracks and senior citizens facilities.

The city has conducted neighborhood and town hall meetings to obtain citizen input into the types of projects for which federal funds should be expended and a three year plan was established. There has been input from both black and white communities, and funds have been obtained for programs such as the Town Creek storm water drainage improvements, the Jones Community Center and concentrated code enforcements to rehabilitate housing in low and moderate income areas. (Exh. D–117 and 118).

Contrary to the intentions of the plaintiffs, the evidence substantiates the fact that there has been no discrimination against blacks in the application for and use of federal funds, but that the overwhelming portion obtained have been spent to benefit primarily black areas in Jackson.

The plaintiffs have introduced evidence that in the planning process and expenditure of federal funds the defendants have been guilty of racial discrimination, and in support of this claim adduced testimony, as well as certain documentary evidence, including Exhibits P–90 through P–97. This last exhibit is a letter from Charles E. Clark, Assistant Regional Administrator for Fair Housing and Equal Opportunity, HUD Regional Office, Atlanta, Georgia, to Mayor Russell C. Davis, advising that the writer's staff had determined that the Jackson City Planning Board was administering the 701 Comprehensive Planning Assistance Program in apparent noncompliance with Title VI of the Civil Rights Act of 1964, and the HUD implementing regulations relative to planning activities in the Midtown Neighborhood Development Planning Area. The defendants countered this evidence through testimony and documentary evidence (Exhs. D–67 through D–70).

Subsequent to the trial of this case, Mr. Donald L. Irvin, the City Planning Director of the Jackson City Planning Board, received a letter dated July 8, 1977 from the same Mr. Clark in which Clark stated that his agency was closing its files on the above complaint, subject to the Jackson City Planning Board continuing to carry out its activities under the 701 Program. The defendants have moved the admission of this letter through a Motion to Re-open, to which the plaintiffs object. Both sides have filed Memoranda of Authorities in support of and in opposition to the Motion, and in the alternative plaintiffs have moved to re-open the evidence to take testimony and introduce additional evidence in the event

that the defendant's Motion is granted. The defendants oppose this alternative request.

■ Whether to permit re-opening of the record to allow the defendants to introduce this letter in evidence from Mr. Clark is within the sound discretion of this Court. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331–332, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); 6A Moore's Federal Practice ¶ 59.04(13) (2nd Ed. 1974). Inasmuch as this case was tried to the Court and this Motion was filed by the defendants shortly after receipt of the letter, which was shortly after the conclusion of the trial, we find that in the interest of justice and fairness this Court should and does grant the Motion of the defendants; therefore this letter is admitted into evidence for the limited purpose of answering the issue of noncompliance raised by the plaintiff, which was also the subject of evidence offered by them to support their contention in that regard. The alternative motion of the plaintiffs to re-open will be granted for the sole and limited purpose of admitting into evidence the letter of September 6, 1977 to Mr. Herman "Tex" Wilson from Barry H. Powell, the attorney representing the complainants in the administrative complaint which was the subject of the July 8 letter from Clark to Irvin. The Motion of the plaintiffs to re-open to present additional evidence in this regard would serve no useful purpose and would unduly delay the disposition of this case and is therefore denied. (The defendants' letter will be marked Exh. D–84 and the plaintiffs' letter will be marked Exh. P–160).

(m) *Public Housing.* Plaintiffs contend that public housing as it exists in Jackson is not "true" public housing. Although an earlier public housing referendum failed, Jackson voluntarily entered this area in 1970 after successfully defending the challenge of certain citizens thereto. See *West Jackson Homeowners and Voters Ass'n v. Jackson Housing Authority,* 283 So.2d 78 (Miss.1973); *Muirhead v. Pilot Properties, Inc.,* 258 So.2d 232 (Miss.1972).

In addition to other responsibilities, the Jackson Housing Authority (JHA) has as its primary objective to provide housing for low and moderate income families, and its efforts in this field have been directed almost entirely to the black community. As previously noted, two of the five member Housing Authority Board are blacks, one of whom is a named plaintiff in this case, Reverend Horace L. Buckley. Blacks on the staff of the JHA include an accounting technician, one social worker, a property improvement inspector, three project managers and eleven maintenance personnel.

Three projects are administered by the JHA, namely, Willow Grove Apartment Project constructed at a cost of $2,069,-845.59 with an annual budget of $381,-188.00; Golden Key Apartments with a construction cost of $2,103,919.00 and an annual budget of $400,647.00; and Whiterock Homes with a construction cost of $1,031,-861.66 and an annual budget of $409,066.00. These three projects respectively consist of 152 single-family dwelling units with 100% black occupancy, 152 elderly handicapped dwelling units and 184 single-family dwelling units with a 99% black occupancy, located in a predominantly white neighborhood (Exhs. D–25 and D–26). Other services include day care centers provided for project residents, community activity centers at the Golden Key and Whiterock projects which include services such as clinics, libraries, gymnasiums and free lunches, constructed at a cost of approximately $1,000,000.00 and the George Kurts Fieldhouse, a gymnasium located in a predominantly black area (Exhs. D–25 and D–26; testimony of Douglas A. Tuttle).

The establishment and administration of public housing by the City of Jackson shows a great sensitivity to the needs of all its citizens in this area, particularly its black citizens.

(n) *Concentrated Code Enforcement.* Jackson's Concentrated Code Enforcement program, operated under the auspices of the Jackson Redevelopment Authority and funded by the city and Department of Housing and Urban Development Code En-

forcement Project, deals primarily with residential properties. It encompasses the inspection of homes to determine if there are any violations of the Standard Housing Code and if the residence is capable of rehabilitation. Most of the work in this area is done on homes that are 10% to 20% dilapidated, and HUD guidelines are utilized in making these determinations. Grants per owner-occupied units may be made up to $4,500 with provisions in the event of unforseen contingencies for an additional $1,000.

Concentrated Code Enforcement has up to this time been in the Hawkins Field and the Jackson State University areas, which are predominantly black, and in the predominantly white Veterans Park area. The majority of available funds have been utilized to rehabilitate black areas, which is evidenced by a total expenditure of $1,622,-286.00 in predominantly black areas as compared to $350,000.00 in predominantly white areas. (Exh. D–30 and D–31, Items 5, 41).

There is thus no evidence of any discriminatory treatment of blacks in the provision of this service.

(o) *Community Improvement.* Jackson's Community Improvement Department was established in February, 1969 and combined with the Rehabilitation Department in 1970, since that time operating as a single unit. The duties and responsibilities of this department are divided into three areas: citywide housing inspections conducted on a daily basis; handling complaints concerning substandard housing; and inspection of vacant property designed to reveal defects in structure, plumbing and electrical equipment and to insure that the owners bring the property into compliance with the Standard Housing Code before the property is occupied again.

The City Council appoints the Housing Board of Adjustments and Appeals, composed of city businessmen to whom property owners may appeal their respective cases and from whom they may obtain additional time in which to comply with the action ordered. This seven member board is composed of two blacks and five whites, while the Community Improvement Department has seventeen employees, five of whom are black. (Exh. D–36). Priority was assigned to and work was begun by this department in predominantly black areas of Jackson, which were considered to be in greater need of attention because of substandard and dilapidated housing.

This department also provides relocation allowances to tenant families up to $100 for moving expenses, and this program is funded totally by the City of Jackson with no federal assistance. One hundred and fourteen (114) of the one hundred and thirty-seven (137) payments of this type made by the city have been to black citizens of Jackson.

(p) *Medical Services.* This Court reserved ruling on the objections of the defendants to evidence offered by the plaintiffs relative to the quality of medical care provided by the city. This evidence consisted of a federal report and the 1970 census statistics (Exh. P–140 at p. 2) and testimony by Mr. Dahlberg. We now conclude that this subject is not germane to the issues herein and thus sustain the objection inasmuch as Jackson is not required to offer and does not offer free medical care or services to its citizens. The responsibility for providing medical services is placed on the Mississippi State Board of Health and the various County Boards of Health. Miss. Code Ann. §§ 41–3–1 *et seq.* (1972). Although municipal regulation of health is permissible under Miss.Code Ann. § 41–3–57 (1972), it is not mandatory, and the "municipality is not constitutionally required to provide a particular quantity or quality of health services." *Cf. Jackson v. New York City Health and Hospital Corp.,* 419 F.Supp. 809, 812 (S.D.N.Y.1976). This Court declines to infer discriminatory purpose from Jackson's failure to provide non-obligatory free medical services to all of its citizens, both black and white. We note, however, that on cross-examination Mr. Dahlberg did testify that Baptist Hospital, one of the city's largest, if not the largest, is located very near predominantly black residential areas and has many doctors' offices in close proximity.

(q) *Police Protection and Police/Community Relations.* The plaintiffs contend that a serious problem of police/community relations exists in Jackson to which the city council has not been sufficiently responsive. They principally rely upon a staff report issued by the United States Commission on Civil Rights. This report dealt with police/community relations in Jackson, and was based upon a January, 1977 investigation following complaints of police harassment and brutality in Jackson made by the Southern Regional Office of the United States Commission on Civil Rights (Exh. P–5). As a result of that investigation the commission concluded that:

> many citizens in Jackson, especially black citizens, have the firm conviction that they have been victimized rather than served by their police department. Their allegations range from harassment to outright brutality. Their fear and anger are compounded by their frustration and the frustration comes from their belief that such conduct goes largely unheeded, and logically from their viewpoint, therefore condoned.

The commission reported that citizens are afraid to lodge complaints of police harassment or brutality with the Department; that citizens—especially black citizens—lack confidence in the will and ability of the police department to police itself; that the Internal Affairs Division of the Police Department is all white; that there is a lack of clearly defined policies and procedures for the investigation of complaints against police officers; that complainants are not advised regarding the Department's action on a complaint; that the nature and extent of any disciplinary action against the offending officers is solely within the discretion of his or her supervisor or that supervisors have no formal or written guidelines regarding disciplinary action to be taken against defendant officers; and that the facts sustain an inference that the "current process of internal review and discipline simply is not effective."

This staff report, attached to an affidavit of Bobby D. Doctor, Southern Regional Director of the United States Commission on Civil Rights, was the only evidence offered by the plaintiffs in support of this contention, and the report noted that the city officials and police department personnel had fully cooperated with the commission's staff in its study. In its introduction the report stated that it was "not intended to be a definitive analysis of the state of police/community relations in Jackson, Mississippi. Indeed it would be presumptuous to assume that two staff members in three days could fully assess a situation so deeply complex and wrought with emotion."

The Court agrees with this latter observation in the report, and in the absence of any other evidence than that offered by the plaintiffs herein, this Court finds that the plaintiffs have failed to prove by a preponderance of the evidence this allegation of police mistreatment or brutality and a problem in police/community relations in Jackson.

## SUMMARY OF FINDINGS ON QUESTION OF RESPONSIVENESS

As was pointed out by the court in *Blacks United v. City of Shreveport, supra,* "[T]he issue of responsiveness in a [voter dilution case] is momentous. Its resolution has considerable probative force on the question [of] whether the plan is being purposefully maintained" for the purpose of diluting minority voting strength. 571 F.2d at 254. Also this issue is of great significance because proof of a governing body's unresponsiveness to minority needs is strongly corroborative of an intentional exploitation of the electorate's bias, allowing representatives to ignore minority interests without fear of reprisal at the polls, where proof of polarized or racial bloc voting exists, as it does here. *Nevett II, supra* at 222–223. Indeed, one of the primary objectives of a free and meaningful electoral process is the insurance or guarantee of systematic responsiveness by a representative governing body answerable to all the electorate.

This Court's task in considering evidence of responsiveness is singularly a factual

one, which must be determined from all the evidence of record. After exhaustive review of that evidence, we find that the ·black citizens of Jackson have free access to the city governing body, which maintains an "open door" policy; blacks have in the last several years, and are now being appointed to positions of importance and responsibility on city boards, agencies and commissions and are being hired by the municipality in increasing numbers to perform jobs at every level; blacks have not been discriminated against or slighted in the dispensing of municipal services, but on the contrary have and are being in many instances favored. In summary, based upon all of the·above specific findings of fact, this Court finds that the governing body of Jackson has in the recent past become, and is now increasingly and systematically responsive to the interests and desires of the black citizens of the city, and is thus representative of all its constituency.

### III. THE ENHANCING FACTORS OR CRITERIA

In addition to enumerating the four previously discussed primary or substantial criteria which must be considered in determining whether there is sufficient circumstantial evidence of intentional discrimination to make out a voting dilution case, *Zimmer* list four enhancing factors, that is, factors the proof of any of which enhances or buttresses a finding of the existence of any of the four primary factors, and which must be considered together with the primary factors in determining whether there is the required proof of intentional discrimination and therefore dilution of minority voting strength. These four enhancing factors will be discussed briefly, inasmuch as they have already been stated herein, and the previous discussion of Mississippi law governing the slating and election of candidates for municipal office in the City of Jackson has in effect answered the question of the existence of the factors.

(a). The size of the district (its electorate) must first be considered, because in order for a voter to know the candidates, for a candidate to attract the attention of the voters and the commitments of time, money and other resources important to the election process, different considerations and factors will vary widely with the size of the electorate. In cases which involved a fairly small electorate, the plaintiffs must prove the precise way in which the system dilutes their voting strength, *David v. Garrison, supra* at 927, but not so where the electoral district is "large." Certainly the present at-large election system is as large as possible, that is, it encompasses the entire 105.36 square miles of the City of Jackson, a city with a current population of approximately 205,000 person, and a voting age .population (including the newly annexed area) of 157,589, of whom 66.62% are white and 33.38% are black.

(b). It is undisputed that in both primary and general elections, in order to be elected, a candidate must receive a majority of the votes cast, and as many runoffs as necessary are held. The candidates for city commissioner do not run for numbered positions because the city council has never passed an ordinance to so provide, as permitted by state law. Miss.Code Ann. § 21–5–5 (1972).

(c). There is an anti-single shot voting provision, because in the primaries and general elections voters must cast their ballot for one candidate for mayor and two for city commissioner. If only one commission candidate is voted for, in either the primary or. general elections, that vote is not counted.

(d). Candidates for mayor or commissioner need not live in or run from particular geographical sub-districts within the city.

In sum, each of the enhancing factors exists in favor of the plaintiffs, and the only mitigating factor found by the court in *Bolden*, namely the absence of primaries, does not exist here.

### IV. THE AGGREGATE OF THE FACTORS

This Court has made its specific findings of fact concerning the existence or

non-existence of the sub-issues, both primary and enhancing. Now we must decide the ultimate issue of fact, and that is in whose favor the "aggregate" of the evidence preponderates, considering all of the criteria together, giving the significance of each and the strength of the showing under it due weight. *Blacks United v. City of Shreveport, supra* at 255. At this point a review of some of the relevant legal principles set out in our previous discussion of voting dilution principles and the method of proving dilution is in order. By proving an aggregation of at least some of the *Zimmer* factors, or similar ones, a plaintiff can demonstrate that the members of the particular group in question are being denied access. *See, Nevett II, supra* at 224–225; *Kirksey v. Board of Supervisors, (en banc) supra* at 139. This determination is peculiarly dependent on the facts of each case and comprehends a "blend of history and an intensely local appraisal of the design and impact of the [at-large] district in the light of past and present reality, political and otherwise." *White v. Register,* 412 U.S. at 769, 770, 93 S.Ct. at 2341. It is therefore our task as the finder of fact to carefully examine and weigh the competing facts to determine whether the incidence of those facts probative of intentional discrimination are sufficient to establish such a finding, within the framework of *Nevett II* and other dilution cases. As stated by the Court in *Arlington Heights, supra,* "determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. at 564. It must be borne in mind that even if the finder of fact determines that the plaintiffs have prevailed under one or even several of the *Zimmer* criteria this still may not estab-

lish the existence of intentional discrimination, *see, e. g., McGill v. Gadsden Co. Commission, supra,* but on the other hand the plaintiffs need not prevail under all of the criteria, *Zimmer, supra* at 1305, nor are they limited in their proof only to those criteria. *Nevett II, supra* at 224–225; *Kirksey v. Board of Supervisors, supra* at 139; *Hendricks v. Joseph, supra* at 1270–1271.

In the process of making this ultimate factual determination this Court is aware of and has kept in mind the following established principles found in the decisions of the United States Supreme Court and the United States Court of Appeals for the Fifth Circuit. Dilution is an elusive concept because it cannot be proven by mathematics alone. It reflects a challenge to the usual election system wherein the candidate of the majority of the voters wins the election. Dilution unconstitutionally abridges or dilutes meaningful participation by a minority by virtue of the fact that a majority of the voters, and the successful governing authority elected by that majority simply ignore, the governmental needs of a substantial minority of the voters and remains arrogant and unresponsive to the voting strength of that minority. It constitutes a violation of the Fourteenth and Fifteenth Amendment guarantee that all citizens and classes of citizens be afforded some meaningful participation in the election process, not just the right to cast a vote. *David v. Garrison, supra* at 925.

▮▮▮ With the cure uncertain, in our federalist system of government federal courts should be loath to interject themselves, into a state-created municipal electoral system and to replace it with a radically different scheme unless the Constitution clearly dictates that the existing system is unlawful.[4]

4. It is highly significant that Mr. Justice Rehnquist in a Separate Opinion, joined by the Chief Justice, and Justice Stewart and Powell, in *Wise v. Lipscomb,* —— U.S. ——, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978) stated:

. . . While this Court has found that the use of multi-member districts in a state legislative apportionment plan may be invalid if "used invidiously to cancel out or minimize the voting strength of racial groups," *White v. Regester,* 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973), we have never had [the] occasion to consider whether an analogue of this highly amorphous theory may be applied to municipal governments. Since petitioners did not preserve this issue on appeal we need not today consider whether relevant constitutional distinctions may be

**1312**

Hendrix v. Joseph, supra at 1271. See Turner v. McKeithen, 490 F.2d 191, 197, fn. 24 (5th Cir. 1973); Howard v. Adams County Bd. of Supervisors, 453 F.2d 455, 458 (5th Cir. 1972) cert. denied 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812 (1972). On the other hand, a majority bloc is not entitled to continue to elect officials who simply ignore the governmental interest of a substantial portion of the population. Consequently, rather than provide a specific definition of dilution, the courts have simply stated that it occurs when the minority voters have no real opportunity to meaningfully participate in the political process. In determining whether unconstitutional dilution exists and enfranchising a diluted minority, care must be taken not to disenfranchise the majority, because this results in merely replacing one evil with another. It also compartmentalizes the electorate, reinforces the bloc voting syndrome and prevents minority class members from exercising any influence in the political system beyond the bounds of their single-member wards, except with reference to the election of a mayor who obviously should be permitted to run from the city at-large, since he' is the head of city government.

 In order to prevail, plaintiffs must establish by a preponderance of the evidence that the at-large system of election complained of operates so as to make the vote of black residents less than equal to the vote of white residents, thereby denying to the former effective participation in the political process of the city government. Reynolds v. Sims, 377 U.S. 533, 565, 84 S.Ct. 1362, 1383, 12 L.Ed.2d 506, 529 (1964). However, as previously emphasized, the en banc court in Kirksey v. Board of Supervisors, supra, held that where there had been a past record of racial discrimination and official unresponsiveness which required the conclusion that until a short number of years past there had been a denial of equal access to the political

processes, the defendants had the burden to come forward with evidence that enough of the incidents of the past had been removed and the effects of past denial of access dissipated, with the result that there is presently equality of access. For the reasons previously stated, this Court finds that the defendants have met this burden. In making this determination, all factors must be considered, and those which imply a non-diluted system cannot be ignored. Hendrix v. Joseph, supra at 1270.

In the case sub judice, although there is admittedly a past history of racial discrimination, nevertheless enough incidents of the past have been removed and the effect of past denial of access have been dissipated with the result there is presently equality of access and effective and meaningful participation of blacks in the electoral or political process that exists in the City of Jackson under the plan or form of government being attacked herein.

The plaintiffs have likewise failed to carry their burden of proving what this Court considers one of the most important of all the Zimmer factors, unresponsiveness to the needs of black Jacksonians. The importancy of this factor has been highlighted by the Fifth Circuit's reference to it as "momentous", Blacks United v. City of Shreveport, supra at 254, and as the sine qua non in Nevett II, supra at 223–224, fn. 19:

Showings of unresponsiveness and lack of access make a strong dilution case. The capacity of a governing body to respond to the needs of its constituency is, in large measure, what makes that body representative. See H. Pitkin, The Concept of Representation 233 (1972). Ideally, electoral processes are designed to provide an institutional and periodic method of guaranteeing governmental responsiveness. "Our concern with elections and electoral machinery, and particularly

---

drawn in this area between a state legislature and a municipal government. I write only to point out that the possibility of such a distinction has not been foreclosed by today's decision.

However, this Court is bound to follow the existing law of the Fifth Circuit, which has applied the voter dilution theory to municipal governments.

with whether elections are free and genuine, results from our conviction that such machinery is necessary to insure systematic responsiveness." *Id.* at 234.

Thus, if representatives are unresponsive to the needs of a racial group apparently because some stages of the electoral process diminish the group's input, the inference that the processes are maintained with the purpose to discriminate can fairly be drawn. "[At-large] districts, it would seem, violate the Equal Protection Clause, not because they overrepresent or underrepresent pure and simple, but because they do that in a context where all stages of the electoral processes have been effectively closed to identifiable classes of citizens, making the political establishment 'insufficiently responsive' to [that classes] interests." Casper, *Apportionment and the Right to Vote: Standards of Judicial Scrutiny*, 1973 Sup.Ct. Rev. 1, 28. *See also Hendrix v. Joseph*, 559 F.2d 1265, 1269 (5th Cir. 1977).

In addition, as pointed out by the court in the above quoted footnote, if a lack of responsiveness is shown, a strong dilution case is made. Thus the resolution of this issue in the defendants' favor, while not of itself determinative of the ultimate issue in this case, has substantial probative force on the question of whether the present plan of government is being purposefully maintained for impermissible and discriminatory reasons, as will be discussed more fully below, and weighs heavily against an inference of intentional discrimination, because the incumbents are not visibly exploiting their majority status to the detriment of their minority constituents. See *Nevett II*, *supra* at 228. The named plaintiff, Henry J. Kirksey, candidly testified to the effect that white candidates for election to the Jackson City Council actively seek the black vote, and that this is what makes them responsive to the needs of blacks. In view of the large percentage of black voters in the city, which can really be the balance of power in municipal elections in Jackson, this Court agrees with Mr. Kirksey's astute observation.

On the other hand, there is no extant state policy which justifies the maintenance of the municipal plan in question, and all four of the enhancing factors, a large district, majority requirement, anti-single shot voting provision and the absence of a geographical sub-district residency requirement, weigh in favor of the plaintiffs.

The existence of a tenuous state policy supported by the enhancing factors does not aggregate to prove a racially motivated dilution of black voting strength in the City of Jackson when weighed against this Court's finding that the other three primary *Zimmer* factors favor the defendants, namely the absence of lingering effects of past discrimination which precludes the effective participation of blacks in the electoral system *today*, open and equal access to the election process by blacks in Jackson, and the existing and systematically and rapidly increasing responsiveness of the city council to the needs and interests of black Jacksonians.

## V. MAINTENANCE OF THE PRESENT FORM OF CITY GOVERNMENT

 It is now well established that neither *Washington v. Davis, supra,* nor any other authority requires the plaintiffs in a voting dilution case to prove discriminatory intent in the *enactment* of a challenged plan, an element this Court has previously discussed and found not to have been proved. Where the plan is *maintained,* either through action or inaction, for the purpose of excluding minority input or devaluing the votes of minorities, the necessary intent is established. *Nevett II, supra* at 222; *Bolden, supra* at 245–246; *Thomasville Branch of N. A. A. C. P. v. Thomas City, Ga., supra* at 258. As was noted in *Nevett II* a remotely enacted plan that was adopted without racial motivations may become a vehicle for the exclusion of minority input because intervening circumstances cause the plan to work that way. Where evidence of discriminatory intent is lacking in the enacting process as here, the *Zimmer* criteria become acutely relevant to the

question of whether the neutral plan is an "instrumentality for carrying forward patterns of purposeful and intentional discrimination." *Kirksey v. Board of Supervisors, supra* at 147; *Nevett II, supra* at 222.

Because of our foregoing findings of fact on the *Zimmer* sub-issues and the aggregate of the issues, we find and conclude that the plaintiffs have failed to prove that intentional discrimination was a motivating factor in the maintenance of the present electoral system or plan. Significantly, as the Court has noted previously in this Opinion, the question of whether to maintain the present form of government in the city, or to change to the mayor-council form under which each council member would be elected from seven single-member districts or wards [which cities such as Jackson are empowered to do pursuant to Miss.Code Ann. § 21–8–1, –47 (Supp.1976)], was submitted to a city-wide referendum vote in February, 1977, and resulted in a majority vote of the electorate favoring retaining the present form of city government, despite the fact that the then Mayor Russell Davis openly and actively supported the proposed change.

## VI. CONCLUSION

Under the facts of this case, the plaintiffs have failed to prove that the claimed dilution was the result of any invidious discriminatory purpose or intent. In the aggregate the *Zimmer* criteria do not point to intentional discrimination as a motivating factor in either the enactment or maintenance of the present form of municipal government and the present electoral process in Jackson, Mississippi.

Accordingly, the defendants shall prepare and present to this Court a Final Judgment conforming with this Memorandum Opinion, approved as to form by counsel for all parties, dismissing this suit with prejudice at the cost of the plaintiffs.